**Maxine GRAYSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 06–CM–1419.

District of Columbia Court of Appeals.

Argued Dec. 20, 2007.
Decided July 24, 2008.

William Francis Xavier Becker, for appellant.

John P. Mannarino, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER, Associate Judge, and BELSON and SCHWELB, Senior Judges.

PER CURIAM:

The majority of the court has concluded that the evidence is sufficient to sustain appellant's conviction of second-degree theft. To be sure, as Judge Schwelb demonstrates in Part III A of his opinion, appellant did not confess to the crime. However, we are not prepared to say that, when the remaining evidence is "view[ed] ... in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ We will not attempt to set forth the evidence in detail—Judge Schwelb's opinion does that. However, it was undisputed that, despite preliminary discussions, a sale of the jacket had not been completed before Ms. Swann left town and that appellant nevertheless entered Ms. Swann's apartment and took the jacket while she was out of the city. Although appellant asserted that she had done so with permission, the trial court, as the judge of credibility, disbelieved that assertion and instead credited Ms. Swann's testimony that she had not given any such permission. The court also rejected appellant's testimony that she paid $75.00 toward the purchase of the jacket before Ms. Swann left town, crediting Ms. Swann's "testimony that the defendant never paid her any money...." Moreover, the finder of fact concluded that appellant changed her story between her first and second interviews

with the detective, betraying her consciousness of guilt. These assessments of credibility, as well as Ms. Swann's testimony, supported the trial court's finding that appellant took the jacket with criminal intent.

■ Nevertheless, the record does not support the trial court's statement that "we have the defendant's confession that she took the jacket without the complaining witness' permission." Perhaps the court meant to say that "the defendant admitted that she took the jacket, and I find that she did so without the complaining witness's permission." But we cannot assume that such an important comment on the evidence was a mere slip of the tongue. Because the reference to a confession is clearly erroneous, "the possibility exists that in finding guilt, the trier of fact was swayed by erroneous factual matter." *In re C.J. III*, 514 A.2d 460, 464 (D.C.1986). Therefore, "we are constrained to remand this case for the court to weigh the evidence in the record afresh and render a new verdict." *Shewarega v. Yegzaw*, 947 A.2d 47, 54 (D.C.2008). *See also National Housing P'ship v. Municipal Capital Appreciation Partners I, L.P.*, 935 A.2d 300, 321 (D.C.2007) (remanding "for reconsideration in light of all the evidence of record"). The court's findings on remand shall be in writing and non-conclusory in nature.

*Vacated and remanded.*

SCHWELB, Senior Judge, concurring in part and dissenting in part:

On October 31, 2006, following a one-day bench trial, Maxine Grayson was found guilty of theft in the second-degree in connection with the taking of a tan leather jacket from the apartment of the complaining witness, Veretta Swann. It is undisputed that Ms. Grayson took the jacket;

her sole contention on appeal is that the evidence was insufficient, as a matter of law, to establish that Ms. Grayson appropriated the jacket without Ms. Swann's consent and with the intent to steal it.

In her oral decision finding Ms. Grayson guilty, the trial judge stated that "of course, we have the defendant's confession that [Ms. Grayson] took the jacket without the complaining witness' permission." A careful examination of the record discloses that there was no confession; on the contrary, Ms. Grayson unequivocally testified that Ms. Swann told her that "you can get the jacket." The trial judge's finding that Ms. Grayson confessed to theft, or to any other wrongdoing, was plainly erroneous and without evidence to support it.

The trial judge's finding that there was a confession when, in fact, there was none, without more, precludes affirmance of Ms. Grayson's conviction and requires, at least, a remand for revised findings which excluded any consideration of a purported confession. Indeed, the majority so holds. In my opinion, however, the remand ordered by the court is inappropriate because, in the absence of a confession, the evidence, viewed in the light most favorable to the prosecution, was insufficient as a matter of law to establish beyond a reasonable doubt that Ms. Grayson "intended either to deprive [Ms. Swann] of a right to the property ... or make use of the property for [herself] ... without authority or right," *Cannon v. United States,* 838 A.2d 293, 296 (D.C.2003) (internal citation omitted). Accordingly, I would reverse the judgment and direct the entry of a judgment of acquittal.

# I.

## THE EVIDENCE

Shortly before Christmas 2005, Veretta Swann lived in a shelter for recovering substance abusers. Ms. Grayson, who apparently had a similar background, was the resident manager. Ms. Swann testified that prior to the events that led to Ms. Grayson's conviction, the two women were friends and that they had "formed a bond."

Ms. Swann owned a tan leather jacket, and she kept it in a closet in her apartment. Both women testified that Ms. Grayson was interested in purchasing the jacket for her daughter, but that she was unable at the time to pay for it. Ms. Swann testified, and Ms. Grayson confirmed, that Ms. Swann offered to let Ms. Grayson have possession of the jacket and to pay for it later. According to both women, however, Ms. Grayson stated that she did not feel comfortable with such an arrangement.[1]

Ms. Swann went to New York for the Christmas holidays. Ms. Swann testified that immediately before her departure, she

> asked [Ms. Grayson] before I left if she wanted the coat. She told me no. I asked her again before I left. I said, are you sure you don't want the coat before I leave. She told me no.

It is thus undisputed that Ms. Swann was offering, until just before Christmas, to let Ms. Grayson take possession of the jacket at once, and to pay for it later.

While Ms. Swann was in New York, she was required, by the rules of the shelter, to call in to Ms. Grayson daily. She testified that she called in on December 22, 23,

---

1.  Ms. Swann's precise testimony on this point was as follows:
    
    Q.  And correct me if I'm wrong My understanding is that you told her she could take it and pay you later?

    A.  I did.

    Q.  And she said, no, I won't do that until I have money.

    A.  Yes.

24, 25 and 26, and she stated that she did not, during any of these conversations, give Ms. Grayson permission to take the jacket. She testified, however, that when she called in on December 26, Ms. Grayson "told me she took the coat." According to Ms. Swann, Ms. Grayson explained during the telephone conversation on the 26th that her daughter had come and that she (Ms. Grayson) had given the jacket to her daughter for Christmas. In response to a question from defense counsel whether "that was the full extent of the conversation between the two of you," Ms. Grayson answered: "Yes." There is no indication in Ms. Swann's testimony that upon being told that Ms. Grayson had taken the jacket, she (Ms. Swann) expressed any outrage or disapproval, or suggested in any way that Ms. Grayson had done anything that Ms. Swann had not wanted her to do. Obviously, Ms. Swann did not regard the taking as theft or as otherwise impermissible.

Ms. Grayson testified that when Ms. Swann called her from New York, she (Ms. Grayson) told Ms. Swann that Ms. Grayson's daughter Brittany was visiting her for Christmas, and she asked Ms. Swann: "Can I go in and get the jacket, being that she's here"? Ms. Grayson stated that Ms. Swann's response was " 'Good looking out! You can get it,' and I got the jacket." [2]

On December 27, Ms. Swann returned to Washington. She discovered that somebody had entered her apartment and had stolen some items from her daughter's closet, and that the intruder had apparently attempted to create the appearance of a burglary. Ms. Grayson, however, has not been charged with complicity in any real or staged burglary. Detective Michael Muhammad, the principal police investigator who came to the scene to investigate a reported burglary, testified that apart from the alleged theft of the jacket, Ms. Grayson had never been charged or linked with burglary or with taking anything from Ms. Swann's apartment.

Detective Muhammad testified that when he came to the shelter, Ms. Grayson, as the resident manager, "took [him] around in the inside of the building." Muhammad stated that he asked Ms. Grayson if she knew anything about Ms. Swann's apartment. According to Muhammad, Ms. Grayson told him that she had not been in Ms. Swann's apartment since Ms. Swann had left (presumably for New York). Later on December 27, however, Detective Muhammad interviewed Ms. Grayson at the 7th District headquarters and advised her of her rights. He testified that "[a]t that point, Ms. Grayson told me that she had taken the jacket because she wanted to give it to her child for Christmas, I believe it was."

Ms. Grayson also testified regarding her contacts with Detective Muhammad. She explained that when she told Detective Muhammad that she had not been in the apartment, she understood the question to be referring to a particular day—December 27. She denied any recollection of having claimed not to have entered the apartment during Ms. Swann's absence, and she testified that she had in fact taken the jacket on December 26, and had so advised the detective at the police station, as indeed she had previously told Ms. Swann over the telephone.

On January 20, 2006, the United States Attorney filed a criminal information charging Ms. Grayson with second-degree

<hr/>

**2.** The testimony of the two women differed in one respect. Ms. Grayson testified that she had made a partial payment of $75.00 for the jacket, while Ms. Swann denied that she had received any payment from Ms. Grayson. The judge credited Ms. Swann and not Ms. Grayson.

theft. Ms. Grayson was terminated from her position and evicted, and she was not permitted any contact with Ms. Swann or other residents. Ms. Swann was invited by one of the prosecutors to discuss the possibility of mediation, in order to determine whether Ms. Grayson could work out something with Ms. Swann to pay for the jacket. Ms. Swann refused the offer of mediation because "I was hurt and mad, probably."

## II.

### THE TRIAL JUDGE'S DECISION

The trial judge found Ms. Grayson guilty as charged. The judge stated, in pertinent part, that she

credited the complaining witness' testimony that the defendant never paid her any money for the jacket, even though the complaining witness at one point was willing to give the defendant the jacket, and then she'd repay her along the way. But that was with the complaining witness giving her the jacket, not with the defendant behind the complaining witness' back coming into her home, invading her space.

The judge also credited Detective Muhammad's testimony that at the apartment complex, Ms. Grayson told him that she had not been in Ms. Swann's apartment, but that later, at the police station, Ms. Grayson admitted that she had taken the jacket and had told Ms. Swann that she had done so. The judge was of the opinion that

[t]he inconsistency in the statements of the defendant to the police officer cer-

tainly was an indication to the fact finder, the Court, that that was her consciousness of guilt, that she had actually committed a crime by going in and taking the complaining witness' jacket while the complaining witness was not in her apartment. Once the complaining witness says she didn't want the jacket, she didn't feel right not giving her any money at that time, then the deal was off. To go there while the complaining witness is out of town and take the jacket is second degree theft.

In articulating her decision, the judge appeared to focus on *the manner* in which Ms. Grayson took the jacket, rather than on the question whether Ms. Swann had consented to Ms. Grayson's taking it. Referring to Ms. Grayson's entry into Ms. Swann's unit during Ms. Swann's absence in New York, the judge found that Ms. Swann was "upset by this invasion of privacy and violation of trust." The judge further found that Ms. Swann

was willing to let [Ms. Grayson] pay for the jacket after, pay in installments after she obtained possession, the defendant obtained possession, had, didn't appear to have any bias or prejudice towards the defendant, until the defendant came and invaded her space and took her property, and then left the apartment in a condition trying to suggest that there was some type of break-in.

Finally, the judge stated that "we have the defendant's confession that she took the jacket without the complaining witness' permission." [3]

---

**3.** At sentencing, the prosecutor stated that he did not oppose probation. The transcript continues as follows:

MS. CARNEY [Counsel for Ms. Grayson]: Your Honor, we appreciate the Government's recommendation for a suspended

sentence. I don't think incarceration would be good in this case. You heard from Ms. Grayson that she is working two jobs. She is struggling with problems in her own life, and we just appreciate that

## III.

## LEGAL ANALYSIS

### A. *The purported confession*

I begin with the trial judge's findings: (1) that there was a "confession" by Ms. Grayson; and (2) that Ms. Grayson "confessed" to taking Ms. Swann's jacket without Ms. Swann's consent. I agree with my colleagues that there is no record evidence to support either of these findings.

"Confessions are admissions of the crime itself." *Jones v. United States*, 111 U.S.App. D.C. 276, 280, 296 F.2d 398, 402 (1961). A confession is "generally defined as a statement admitting or acknowledging *all* facts necessary for convictions of the crime at issue." EDWARD W. CLEARY, MCCORMICK ON EVIDENCE § 144, at 362 (1984). (Emphasis added.) "Exculpatory statements, denying guilt, cannot be confessions." *Opper v. United States*, 348 U.S. 84, 91 n. 7, 75 S.Ct. 158, 99 L.Ed. 101 (1954). While Ms. Grayson acknowledged that she took the jacket from Ms. Swann's apartment, she denied having done so without Ms. Swann's consent. Accordingly, and contrary to the judge's finding, Ms. Grayson did not confess to the crime of theft or, indeed, to any crime.

Theoretically, one might attribute the judge's finding that Ms. Grayson "confessed" to a slip of the tongue or to an imprecise use of words; hypothetically, the judge might have meant "admission" when she said "confession." That, however, is not what occurred in this case. The judge found that Ms. Grayson confessed "that she took the jacket *without the complaining witness' permission."* (Emphasis added.) There is no evidence that Ms. Grayson admitted not having Ms. Swann's consent to take the coat. Thus, the erroneous finding that Ms. Grayson confessed that she took the jacket without the owner's consent goes to the principal issue— indeed, the sole issue—in the case.

"A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (internal citation omitted). If Ms. Grayson *had* confessed to taking the jacket without Ms. Swann's permission, she would have had no defense on the merits, and a finding of guilt could not be reasonably disputed. The erroneous finding that Ms. Grayson admitted lack of consent and confessed to the commission of theft was therefore highly prejudicial, and it cannot reasonably be viewed as harmless. Accordingly, even if there was no other error, Ms. Grayson's conviction could not stand, and the case would have to be remanded to

recommendation and would ask the Court to concur with that.

THE COURT: Anything defendant would like to say before I sentence you, ma'am?

MS. GRAYSON: No.

SENTENCING

THE COURT: I'm sentencing you as follows. You had a very important position, people there relying on you. You have to have the key to the facilities and access to their personal belongings, and you breached that trust. And the Court believes that in viewing the allocution of the parties and the record, I'm sentencing you as follows, ma'am.

Twenty-five days in jail, $50 to the Victims of Violent Crime Compensation Fund, and that is due by June 1st 2007. Anything further from the Government.

MR. MADRINAN [Counsel for the government]: No, Your Honor.

THE COURT: Defense Counsel?

MS. CARNEY: Your Honor, I would ask if the Court could possibly allow her to do that on weekends, because her employment's just so critical in her life right now, and she'll lose that if she's stepped back.

THE COURT: Request is denied. Step back to the marshal, ma'am. Parties are excused. Have a good day.

the trial judge with directions to make revised findings not undermined by the judge's incorrect belief that there had been a confession. That, indeed, is the majority's disposition of the appeal.

## B. *The sufficiency of the evidence*

The more difficult question is whether the evidence against Ms. Grayson, aside from the purported confession, was insufficient as a matter of law to support her conviction. Ms. Grayson's burden with respect to this issue is a heavy one, especially where, as in this case, the trial judge has made credibility findings favorable to the prosecution. Nevertheless, based largely on the testimony of the complaining witness herself, I am of the opinion that Ms. Grayson's conviction must be reversed for evidentiary insufficiency.

In reviewing the sufficiency of the evidence, we must view the record in the light most favorable to the prosecution, giving full weight to the right of the trier of fact to determine the credibility of the witnesses, to weigh the evidence, and to draw reasonable inferences. *See, e.g., Rivas v. United States,* 783 A.2d 125, 134 (D.C. 2001) (en banc); *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987); *accord, In re T.M.,* 577 A.2d 1149, 1151 (D.C.1990) (bench trial). We may reverse on insufficiency grounds if, and only if, "the evidence, when viewed in the light most favorable to the government, is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." *Curry,* 520 A.2d at 263 (emphasis in original). Moreover, an appellate court's task, in ruling on a claim of evidentiary insufficiency,

> does not require a court to ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original) (citations omitted).

At the same time, however, the requirement of proof beyond a reasonable doubt is an exacting one. It requires the finder of fact "to reach a subjective state of near certitude of the guilt of the accused." *Id.* at 315. Moreover, "[p]roof beyond a reasonable doubt is not merely a guideline for the trier of fact, it also furnishes a standard for judicial review of the sufficiency of the evidence." *Rivas,* 783 A.2d at 130 (citing *Jackson,* 443 U.S. at 316–17, 99 S.Ct. 2781). In other words, appellate review of claims of evidentiary insufficiency is not "toothless," and "[w]e have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that [the trier of fact] behaving rationally really could find it persuasive beyond a reasonable doubt." *Id.*

Essentially, then, we must decide whether, viewing the record in the light most favorable to the prosecution, the trial judge could fairly conclude, beyond a reasonable doubt, *i.e.,* almost to a certainty, that Ms. Grayson knowingly took Ms. Swann's jacket without Ms. Swann's consent and with the intent to appropriate it to her own use, *i.e.,* to steal it. In this regard, based on Ms. Swann's own testimony, certain critical facts are undisputed:

1. Ms. Swann offered Ms. Grayson the opportunity to take possession of the jacket and to pay for it later;

2. this offer remained open until the eve of Ms. Swann's departure for New York;

3. although Ms. Swann testified that in her telephone conversations during her

334

stay in New York, she did not consent to the taking of the jacket, there was no testimony that the previous offer, which Ms. Grayson had declined, was ever withdrawn, or that Ms. Swann ever told Ms. Grayson that the offer was no longer open;

4. on December 26, Ms. Grayson told Ms. Swann that she had taken the jacket for her daughter, a revelation that cannot readily be reconciled with a belief on Ms. Grayson's part that she had stolen the jacket; and

5. when told by Ms. Grayson that the latter had taken the jacket, Ms. Swann made no request that the jacket be returned, nor did she reprove Ms. Grayson or protest in any way.

In her closing argument at the trial, Veta Carney, Esquire, Ms. Grayson's trial counsel, adroitly and I think, fairly, analyzed the evidence of record, and her presentation merits quoting at some length:

Your Honor, there's a big problem in this case for the Government, and the big problem comes from its own witness. Ms. Swann said that she tried to give this coat to this lady without any money. She was trying to sell it and told her she could take it. She also says on December 26, she spoke to Ms. Grayson on the phone and Ms. Grayson told her she took the jacket. Now today, she, this was not with her permission, there was no agreement. On December 26th when Ms. Grayson told her that she took the jacket, she did not call the addictions counselor to report Ms. Grayson. She did not call the police. She did nothing.

And the only reason, reasonable conclusion is that it was okay. Because she was friends. She had built a rapport with her. And she wanted to give that jacket to Ms. Grayson for her daughter and work out a payment situation.

She comes home and the problems that she found in her daughter's room, the officer said they've never been able to link any of that to Ms. Grayson. Ms. Grayson has told people she went in to open the apartment and went into that closet, got that coat with the permission of the complainant, with Ms. Swann's permission. Her story is completely consistent with the, so many admissions by the complainant that she indeed tried to sell her the coat, told her she could take the coat, talked to her on the 26th, and indeed was told she took the coat.

This is, this is not, oh my goodness, some, she broke into my apartment without my permission and took the coat. These were ongoing associations with two people. At most where this case ought to be is maybe in a small claims court. Maybe there's a civil case here,[4] but it's certainly not criminal intent.

To be sure, counsel's argument was made to assist the trial judge in her role as fact-finder, while our task is to determine the *legal* sufficiency of the evidence to prove guilt beyond a reasonable doubt. Nevertheless, I do not see how, on this record, the trier of fact could fairly find, beyond a reasonable doubt, that Ms. Car-

4. In his argument in opposition to Ms. Grayson's motion for judgment of acquittal, the prosecutor invoked the law of contracts: "It was an offer and not an agreement. I believe there was never a meeting of the minds. Therefore, there was never authorization for Ms. Grayson to enter that apartment...." It is noteworthy that the charge against Ms. Grayson was taking the jacket without consent, *and not entering the premises without consent.* Both the prosecutor and the judge appeared to focus more on the uncharged conduct that we have italicized than on the issue whether Ms. Swann consented to the taking of the jacket.

ney's common sense assessment is unsound.

The merits of the case are implicated by the trial judge's finding, based on her assessment of credibility, that Ms. Grayson initially told Detective Muhammad that she had not been in Ms. Swann's unit at all during Ms. Swann's absence, and that she only later admitted at the police station that she had taken the coat. The judge found that Ms. Grayson's initial statement was untruthful and that it reflected consciousness of guilt on Ms. Grayson's part. Generally, false exculpatory statements may reflect consciousness of guilt, from which guilt itself may reasonably be inferred. *See, e.g., Irick v. United States*, 565 A.2d 26, 30 & n. 8 (D.C.1989) (citing 2 JOHN HENRY WIGMORE, EVIDENCE, § 278 (Chadbourn rev. ed. (1979)). I note, however, that in determining whether Ms. Grayson's statement to Detective Muhammad was a deliberate lie (as the government contended) or an answer based on a misunderstanding of the question (as Ms. Grayson testified), the judge evidently did not take into consideration, and she certainly did not allude to, the telling sequence of events which, in my view, make the finding of consciousness of guilt extremely questionable. Ms. Swann testified that on December 26, Ms. Grayson had told her over the telephone that she (Ms. Grayson) had taken the jacket. Any doubt as to the identity of the taker was surely removed by this disclosure to the complainant. Under these circumstances, it is difficult to understand why Ms. Grayson would deliberately lie to the detective about something that she had already acknowledged doing, only to correct her account at the police station later on the same day.

With the supposed confession out of the case, Ms. Grayson's alleged consciousness of guilt, had it been demonstrated, would be the principal remaining weapon in the prosecution's arsenal. Yet, on this critical point, the judge opted for finding a deliberate lie over a misunderstanding even though there was no evident reason for Ms. Grayson to tell the lie which supposedly warranted the finding of consciousness of guilt. In other words, to put it bluntly, the judge, in finding Ms. Grayson guilty, ignored two facts that, viewed objectively, were surely devastating to the prosecution's case:

1. When Ms. Swann first learned from Ms. Grayson that Ms. Grayson had taken the jacket, her reaction (or lack thereof) was irreconcilable with the notion that Ms. Grayson had committed a theft; and

2. When Ms. Grayson supposedly showed consciousness of guilt by withholding the truth from Detective Muhammad, she had already told the truth to Ms. Swann, she had no reason to conceal it, and as the detective acknowledged, she told him the truth at the police station.[5]

I do not lightly second-guess a trial judge's credibility finding. She presided at the trial; I only read the transcript. But in the truly exceptional case, the limitations of a cold transcript notwithstanding, "we may ... disregard ... credibility determinations where we find them to be unreasonable, self-contradictory, or based on inadequate reasoning." *Eilers v. District of Columbia Bureau of Motor Vehicles Servs.*, 583 A.2d 677, 685 (D.C.1990) (quoting *Midwest Stock Exch. Inc. v. NLRB*, 635 F.2d 1255, 1265 (7th Cir.1980)). To me, this is the kind of exceptional case in which the quoted language from *Eilers*

---

**5.** The judge's "consciousness of guilt" finding may very well also have been influenced by her mistaken belief that Ms. Grayson had confessed.

applies. Moreover, in *Eilers*, the matter at issue was the suspension of Mr. Eilers' driver's license and the standard of proof was the existence, *vel non*, of substantial evidence. Here, Ms. Grayson's liberty was at stake, and the prosecution was required to prove her guilt beyond a reasonable doubt.

At the conclusion of her closing argument, Ms. Grayson's attorney captured the essence of what the record in this case shows:

> She didn't go into the apartment on the 27th, but she was fired [on] the 27th. She went to the precinct. She cooperated and she told the officer on a videotape, which the Government could have played here, but she told the officer, I took the coat. The officer said she took the coat. There's no dispute. She took the coat. She wanted to pay for it. She says she paid some money. Ms. Swann said she didn't.[6] Ms. Swann admitted that after this was over, Ms. Grayson was evicted from that location, could not come back to that location, could not try to discuss or deal with her and try to work it out. Once she was in the court system, she wanted to do a mediation to make payments on that coat to make it right by Ms. Swann.
>
> Your Honor, we have a really difficult situation here with people. It's a shame that a relationship that I think at one time was very close fell apart. But what we don't have here is criminal intent on the part of Ms. Grayson. At most, we have perhaps misunderstandings between the two women, but we don't have a, we don't have a crime here.

The scenario described by counsel is based primarily, if not exclusively, on the testimony of the prosecution witnesses. Viewing the record in the light most favorable to the government, but recognizing that the government was required to show "near certitude of the guilt of the accused," *Jackson*, 443 U.S. at 315, 99 S.Ct. 2781, I am satisfied that no trier of fact could fairly conclude, beyond a reasonable doubt, that Ms. Grayson took Ms. Swann's jacket with the intent to steal it. Accordingly, Ms. Grayson's conviction should be reversed with directions to enter a judgment of acquittal.

---

**6.** The judge stated that she credited Ms. Swann and not Ms. Grayson on this point. This finding provides some support for the government's theory, but it too may have been influenced by the judge's impression that Ms. Grayson had confessed. In any event, the dispute over partial payment does not go to the central issue here, which is whether Ms. Grayson knowingly took the jacket without Ms. Swann's consent and with the intent to steal it.